**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Mole,* Slip Opinion No. 2016-Ohio-5124.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5124

THE STATE OF OHIO, APPELLANT, *v.* MOLE, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Mole,* Slip Opinion No. 2016-Ohio-5124.]**

*Criminal law—Sexual battery—R.C. 2907.03(A)(13) unconstitutional—Statute violates equal protection by irrationally imposing strict liability on peace officers—Government cannot punish class of professionals without making connection between classification and prohibited act—Creating separate class for peace officers in order to subject their off-duty behavior to criminal sanctions on basis of strict liability is not rationally related to governmental interest in maintaining public confidence in law enforcement, ensuring integrity of its members, or protecting minors from sexual exploitation.*

(No. 2013-1619—Submitted July 9, 2014—Decided July 28, 2016.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 98900, 2013-Ohio-3131.

_____

**O'CONNOR, C.J.**

**{¶ 1}** In this appeal, we address the validity of a facial constitutional attack, on equal-protection grounds, against a subdivision of Ohio's sexual-battery statute, R.C. 2907.03(A)(13). R.C. 2907.03(A)(13) prohibits sexual conduct when one person is a minor and "the offender is a peace officer, and the offender is more than two years older than the other person."

**{¶ 2}** R.C. 2907.03 is generally a valid scheme insofar as it imposes strict liability for sexual conduct between various classes of offenders who exploit their victims through established authoritarian relationships. But subdivision (A)(13) irrationally imposes that same strict liability on peace officers even when there is no occupation-based relationship between the officer and the victim. We therefore conclude that R.C. 2907.03(A)(13) is an arbitrarily disparate treatment of peace officers that violates equal protection under the Ohio Constitution and the United States Constitution. Accordingly, we affirm the decision of the Eighth District Court of Appeals declaring R.C. 2907.03(A)(13) facially unconstitutional.

## RELEVANT BACKGROUND

**{¶ 3}** Appellee, Matthew Mole, was a police officer. He first encountered J.S. when J.S. initiated a conversation with Mole through the use of a dating application on his mobile phone.

**{¶ 4}** J.S. claimed to be 18 years old and a senior in high school. Mole was 35. Upon J.S.'s invitation, Mole came to J.S.'s house at 3:00 a.m. on December 19, 2011, and was led into an unlit sunroom at the back of the house. The two undressed and performed oral sex on each other in the dark. They were discovered by J.S.'s mother shortly after. At that point, Mole learned, for the first time, that J.S. was 14 years old.

**{¶ 5}** Mole was charged with one count of unlawful sexual conduct with a minor, R.C. 2907.04, which prohibits sexual conduct with a minor between the ages of 13 and 15 years old when the offender is 18 or older and knows the other person's

age or is reckless in that regard. He was also charged with one count of sexual battery under R.C. 2907.03(A)(13), which prohibits sexual conduct by a peace officer with a minor when the officer is more than two years older than the minor.

{¶ 6} Before trial, Mole moved the trial court to declare R.C. 2907.03(A)(13) unconstitutional and to dismiss the sexual-battery charge from the indictment. Mole unsuccessfully argued that the statute's lack of a mens rea and failure to connect a defendant's occupational status with proscribed sexual activity violates equal protection and due process. The trial court summarily denied the motion.

{¶ 7} At trial, Mole elected to have the unlawful-sexual-conduct charge tried to the jury and the sexual-battery charge tried to the bench. The jury became deadlocked, the court declared a mistrial, and the state dismissed the indictment as to the charge under R.C. 2907.04.

{¶ 8} But the bench trial resulted in Mole's conviction for sexual battery under R.C. 2907.03(A)(13), which makes peace officers strictly liable for sexual conduct with anyone under the age of 18 when the offender is more than two years older. Thus, despite the jury's inability to find that Mole was reckless with regard to J.S.'s age, the state was nevertheless able to obtain Mole's conviction for the same conduct based solely on Mole's chosen profession, i.e., without proving that Mole knew or was reckless about J.S.'s age, without proving that J.S. knew that Mole was a peace officer, and without proving that Mole's profession and status as a peace officer had any relation to his acquaintance with J.S. or the sexual conduct with him. Mole was sentenced to two years in prison.

{¶ 9} Mole appealed to the Eighth District Court of Appeals, arguing that R.C. 2907.03(A)(13) violated the Equal Protection and Due Process Clauses of both

the Ohio Constitution and the United States Constitution. In a split decision,[1] the appellate court concluded that R.C. 2907.03(A)(13) violated equal protection and was facially unconstitutional. We accepted the state's discretionary appeal, in which the state asserts that R.C. 2907.03(A)(13) does not violate the Equal Protection Clause of the United States Constitution or the Ohio Constitution.

### ANALYSIS

{¶ 10} At the outset, we are mindful of our duty to defer to the General Assembly:

> A statute is presumed constitutional. "In enacting a statute, it is presumed that * * * [c]ompliance with the constitutions of the state and of the United States is intended." R.C. 1.47(A). *See also State v. Carswell,* 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547, ¶ 6. Courts have a duty to liberally construe statutes "to save them from constitutional infirmities." *Desenco, Inc. v. Akron,* 84 Ohio St.3d 535, 538, 706 N.E.2d 323 (1999).

*Mahoning Edn. Assn. of Dev. Disabilities v. State Emp. Relations Bd.,* 137 Ohio St.3d 257, 2013-Ohio-4654, 998 N.E.2d 1124, ¶ 13. However, this presumption of constitutionality is rebuttable. *State ex rel. Dickman v. Defenbacher,* 164 Ohio St. 142, 128 N.E.2d 59 (1955), paragraph one of the syllabus.

{¶ 11} The presumption of constitutionality is rebutted only when it appears beyond a reasonable doubt that the statute and the Constitution are clearly incompatible. *Id.*; *State v. Hayden,* 96 Ohio St.3d 211, 2002-Ohio-4169, 773 N.E.2d 502, ¶ 7. When incompatibility is clear, it is the duty of this court to declare

---

[1] Although Judge Stewart concurred in judgment only and Judge Celebrezze dissented, Judge Stewart agreed that Mole's conviction under R.C. 2907.03(A)(13) was unconstitutional. 2013-Ohio-3131, 994 N.E.2d 482, ¶ 48 (Stewart, A.J., concurring in judgment only).

the statute unconstitutional. *Cincinnati City School Dist. Bd. of Edn. v. Walter,* 158 Ohio St.2d 368, 383, 390 N.E.2d 813 (1979).

{¶ 12} With these principles in mind, we turn to the Constitution and our analysis of R.C. 2907.03(A)(13).

{¶ 13} Article I, Section 2 of the Ohio Constitution provides that "[a]ll political power is inherent in the people. Government is instituted for their equal protection and benefit * * *." The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

{¶ 14} Although this court previously recognized that the Equal Protection Clauses of the United States Constitution and the Ohio Constitution are substantively equivalent, and that the same review is required, *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 60, 717 N.E.2d 286 (1999) ("the federal and Ohio Equal Protection Clauses are to be construed and analyzed identically"), we also have made clear that the Ohio Constitution is a document of independent force, *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42, 616 N.E.2d 163 (1993). As we explained in *Arnold*:

> The United States Supreme Court has repeatedly reminded state courts that they are free to construe their state constitutions as providing different or even broader individual liberties than those provided under the federal Constitution. *See, e.g., City of Mesquite v. Aladdin's Castle, Inc.* (1982), 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152, 162 (" * * * [A] state court is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee."); and *California v. Greenwood* (1988),

486 U.S. 35, 43, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30, 39 ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."). See, also, *Pruneyard Shopping Ctr. v. Robins* (1980), 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741, 752. Further, in *Michigan v. Long* (1983), 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476-3477, 77 L.Ed.2d 1201, 1214-1215, the Supreme Court reinforced its comments in this area by declaring that the state courts' interpretations of state constitutions are to be accepted as final, as long as the state court plainly states that its decision is based on independent and adequate state grounds.

*Arnold* at 41-42.

{¶ 15} *Arnold* stands as the court's first clear embrace of Justice William J. Brennan's watershed article, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489 (1977), which has been described as a "plea for a renaissance in state constitutionalism." Kahn, *Interpretation and Authority in State Constitutionalism,* 106 Harv.L.Rev. 1147 (1993).

{¶ 16} Notably, however, in the wake of *Arnold*, we have often, but inconsistently, heeded the hortatory call to the new federalism.

{¶ 17} Four years after our decision in *Arnold,* this court disavowed the "new federalism," at least in the context of the constitutional rights protecting individuals from searches and seizures by the government. *State v. Robinette*, 80 Ohio St.3d 234, 238, 685 N.E.2d 762 (1997) ("Despite this wave of New Federalism, where the [state and federal constitutional] provisions are similar and no persuasive reason for a differing interpretation is presented, this court has determined that protections afforded by Ohio's Constitution are coextensive with those provided by the United States Constitution"). But two years later, in

6

*Simmons-Harris v. Goff*, we again made clear that even when we previously have discussed provisions in the federal and Ohio Constitutions jointly, we will not "irreversibly tie ourselves" to an interpretation of the language of the Ohio Constitution just because it is consistent with language of the federal Constitution. 86 Ohio St.3d 1, 10, 711 N.E.2d 203 (1999). And the following year, in *Humphrey v. Lane*, we made clear that the Ohio Constitution's Free Exercise Clause grants broader protections to Ohio's citizens than the federal Constitution affords. 89 Ohio St.3d 62, 68, 728 N.E.2d 1039 (2000).

{¶ 18} In 2003, we again embraced the new federalism, even in areas in which we had rejected it previously. In *State v. Brown*, we departed from *Robinette'*s disavowal of the new federalism and held that Article I, Section 14 of the Ohio Constitution "provides greater protection than the Fourth Amendment to the United States Constitution against warrantless arrests for minor misdemeanors." 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, syllabus. And three years later, we held that Article I, Section 10 of the Ohio Constitution provides greater protection to criminal defendants than the Fifth Amendment to the United States Constitution. *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 48.

{¶ 19} Soon thereafter, we announced that Ohio's Constitution protected Ohioans from government appropriation of their private property if the appropriation was based solely on the fact that it would provide an economic benefit to the community. *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, paragraph one of the syllabus. In doing so, we were undaunted by the fact that the United States Supreme Court had recently expressly permitted similar takings under federal constitutional law. *Kelo v. New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). *See Norwood,* ¶ 76 (expressly rejecting *Kelo*'s approach for interpreting the Ohio Constitution).

**{¶ 20}** Our decisions that have affirmed our autonomy under the Ohio Constitution to afford our people greater rights than those secured by the federal Constitution have not been without dissents, including dissents by the justice authoring this opinion. *See, e.g., Brown,* ¶ 26-32 (O'Connor, C.J., dissenting). More recently, our decisions holding that the Due Process Clause of the Ohio Constitution forbids the use of uncounseled juvenile dispositions to enhance the penalty of a subsequent offense*, State v. Bode*, 144 Ohio St.3d 155, 2015-Ohio-1519, 41 N.E.3d 1156, and that traffic stops for even minor misdemeanors that are made outside of an officer's statutory jurisdiction violate Article I, Section 14 of the Ohio Constitution, *State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496, were also met with vigorous dissents. *See Bode* at ¶ 31-42 (French, J., dissenting); *Brown* at ¶ 28-43 (French, J., dissenting). But the fact that the adoption of independent state constitutional law provokes " 'bitter, accusatorial' " dissents, *State v. Short,* 851 N.W.2d 474, 486 (Iowa 2014), quoting Williams, *The Law of American State Constitutions* 180 (2009), does not dissuade us.

**{¶ 21}** We once again reaffirm that this court, the ultimate arbiter of the meaning of the Ohio Constitution, can and will interpret our Constitution to afford greater rights to our citizens when we believe that such an interpretation is both prudent and not inconsistent with the intent of the framers. We also reaffirm that we are not confined by the federal courts' interpretations of similar provisions in the federal Constitution any more than we are confined by other states' high courts' interpretations of similar provisions in their states' constitutions. As Judge Sutton has explained,

> There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed the same. Still less is there reason to think that a highly generalized

guarantee, such as prohibition on "unreasonable" searches, would
have just one meaning for a range of differently situated sovereigns.

Sutton, *What Does—and Does Not—Ail State Constitutional Law,* 59 U.Kan.L.Rev. 687, 707 (2011).  Federal opinions do not control our independent analyses in interpreting the Ohio Constitution, even when we look to federal precedent for guidance*.  See Doe v. State*, 189 P.3d 999, 1007 (Alaska 2008).

{¶ 22} We can and should borrow from well-reasoned and persuasive precedent from other states and the federal courts, but in so doing we cannot be compelled to parrot those interpretations.  *See Davenport v. Garcia*, 834 S.W.2d 4, 20-21 (Tex.1992).  Instead, we embrace the notion that we may, and should, consider Ohio's conditions and traditions in interpreting our own state's constitutional guarantees.  *See* Sutton, *Why Teach─And Why Study─State Constitutional Law,* 34 Okla.City U.L.Rev. 165, 173-174 (2009).  In doing so, we are cognizant that "the individual-rights guarantees of the Bill of Rights were based on pre-existing state constitutional guarantees, not the other way around."  *Id*. at 176; *see also Short*, 851 N.W.2d at 481-482 (state constitutions were the original sources of written constitutional rights and the founders first looked to the states for the preservation of those rights).  This is particularly important to remember whenever the United States Supreme Court's decisions dilute or underenforce important individual rights and protections.  *See Short* at 486, citing Williams, *The Law of American State Constitutions* at 137.

{¶ 23} With these understandings in mind, we turn to the question before us, which arises in the realm of equal-protection principles under both the federal and Ohio Constitutions.  As explained below, we hold that R.C. 2907.03(A)(13) is violative of both.  In so holding, however, we make clear that even if we have erred in our understanding of the federal Constitution's Equal Protection Clause, we find that the guarantees of equal protection in the Ohio Constitution independently

forbid the disparate treatment of peace officers through a legislative scheme that criminalizes their sexual conduct while removing virtually all of their due-process protections, such that an officer's conduct can constitute a criminal offense even when that conduct is not found to be illegal by a jury of the officer's peers.

### *Equal Protection*

{¶ 24} An equal-protection analysis of any law centers upon the law's classification of persons and whether the classification relates to a legitimate government interest. *State ex rel. Doersam v. Indus. Comm.*, 45 Ohio St.3d 115, 119-120, 543 N.E.2d 1169 (1989). The federal Equal Protection Clause does not prohibit a legislature from creating laws that treat a group of people differently from others outside the group. But it does prohibit different treatment based on criteria that are unrelated to the purpose of the law. *Johnson v. Robison*, 415 U.S. 361, 374, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *State ex rel. Doersam* at 119-120. "[A]ll persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As the high court has explained,

> The equal protection clause, like the due process of law clause, is not susceptible of exact delimitation. No definite rule in respect of either, which automatically will solve the question in specific instances, can be formulated. Certain general principles, however, have been established, in the light of which the cases as they arise are to be considered. In the first place, it may be said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances, *Kentucky Railroad Tax Cases*, 115 U.S. 321, 337, 6 S.Ct. 57, 29 L.Ed. 414 [1885]; *Magoun v. Illinois Trust & Savings Bank*, 170 U.S. 283, 293, 18 S.Ct. 594, 42 L.Ed. 1037 [1898], and that it applies

10

to the exercise of all the powers of the state which can affect the individual or his property * * *.

*Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37, 48 S.Ct. 423, 72 L.Ed. 770 (1928).

{¶ 25} Although the federal Equal Protection Clause does not forbid classification, any classification must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. *Id.*, citing *Schlesinger v. Wisconsin*, 270 U.S. 230, 240, 46 S.Ct. 260, 70 L.Ed. 557 (1926); *Air-way Corp. v. Day*, 266 U.S. 71, 85, 45 S.Ct. 12, 69 L.Ed. 169 (1924); *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920). "[T]he attempted classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." *Id.*, citing *Gulf, Colorado & Santa Fe Ry. v. Ellis*, 165 U.S. 150, 155, 17 S.Ct. 255, 41 L.Ed. 666 (1897). And "[d]iscrimination[] of an unusual character especially suggest[s] careful consideration to determine whether they are obnoxious to the constitutional provision." *Id.* at 37-38.

### *The classification at issue*

{¶ 26} R.C. 2907.03 outlaws sexual battery, and the classification in R.C. 2907.03(A)(13) is of peace officers. R.C. 2907.03(C)(4) states that " '[p]eace officer' has the same meaning as in section 2935.01 of the Revised Code."[2] We first note that Mole does not claim that this classification involves a fundamental

---

[2] R.C. 2935.01's lengthy definition of "peace officer" includes not only police officers, sheriffs and deputy sheriffs, and the state highway patrol, but a variety of less expected categories of officers, such as the house of representatives sergeant at arms, certain investigators employed by the Department of Taxation, park and wildlife officers, special police officers employed at municipal airports, and many others.

right or a suspect class. Accordingly, the standard of review in this case is the "rational basis" test, which requires that the statute be upheld if it is rationally related to a legitimate governmental purpose. *State v. Peoples*, 102 Ohio St.3d 460, 2004-Ohio-3923, 812 N.E.2d 963, ¶ 7, citing *Roseman v. Firemen & Policemen's Death Benefit Fund,* 66 Ohio St.3d 443, 447, 613 N.E.2d 574 (1993); *Am. Assn. of Univ. Professors* at 57-58.

{¶ 27} Under a federal rational-basis analysis,

The appropriate standard of review is whether the difference in treatment between [the affected class and those outside the class] rationally furthers a legitimate state interest. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, see *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 174, 179, 101 S.Ct. 453, 459, 461, 66 L.Ed.2d 368 (1980), the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, see *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. [432] at 446, 105 S.Ct. [3249] at 3257 [87 L.Ed.2d 313].

*Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Similarly, under the Ohio Constitution,

"The rational-basis test involves a two-step analysis. We must first identify a valid state interest. Second, we must determine

12

whether the method or means by which the state has chosen to advance that interest is rational." *McCrone v. Bank One Corp.,* 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 9, citing *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.* (1995), 73 Ohio St.3d 260, 267, 652 N.E.2d 952.

"Under the rational-basis standard, a state has no obligation to produce evidence to sustain the rationality of a statutory classification." *Columbia Gas Transm. Corp. v. Levin,* 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 91, citing *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter,* 87 Ohio St.3d at 58, 60, 717 N.E.2d 286. "[S]tatutes are presumed to be constitutional and * * * courts have a duty to liberally construe statutes in order to save them from constitutional infirmities." *Eppley [v. Tri-Valley Local School Dist. Bd. of Edn.],* 122 Ohio St.3d 56, 2009-Ohio-1970, 908 N.E.2d 401, ¶ 12, citing *Desenco, Inc. v. Akron* (1999), 84 Ohio St.3d 535, 538, 706 N.E.2d 323. The party challenging the constitutionality of a statute "bears the burden to negate every conceivable basis that might support the legislation." *Columbia Gas Transm. Corp.* at ¶ 91, citing *Lyons v. Limbach* (1988), 40 Ohio St.3d 92, 94, 532 N.E.2d 106.

*Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 19-20.

**{¶ 28}** Although the legislature has no obligation to justify or even state its reasons for making a particular classification, rational-basis review, whether under Ohio constitutional principles or federal ones, does not mean toothless scrutiny. *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). And the rational-basis test requires that the classification must bear a rational

relationship to a legitimate government interest or that reasonable grounds must exist for drawing the distinction. *Holeton v. Crouse Cartage Co.*, 92 Ohio St.3d 115, 131, 748 N.E.2d 1111 (2001). In other words, the Equal Protection Clause requires that "in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' " *Rinaldi v. Yeager*, 384 U.S. 305, 309, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), quoting *Baxstrom v. Herold,* 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). Thus, although we respect that the General Assembly has the power to classify, we insist that its classifications must have a reasonable basis and may not "subject individuals to an arbitrary exercise of power." *Conley v. Shearer*, 64 Ohio St.3d 284, 288, 595 N.E.2d 862 (1992). "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

{¶ 29} What, then, is the "object to be obtained" by R.C. 2907.03(A)(13) and its classification of peace officers? Our assessment of possible state interests behind R.C. 2907.03(A)(13) is best served by first reviewing the history of similar sex-crime legislation and the legislative history leading up to the enactment of the statute.

### *Historical Background of R.C. 2907.03 and Strict-Liability Sex Crimes Based on Relationships*

{¶ 30} Legislative perspectives on laws proscribing sex between certain classes of people have been mutable over the decades as societal norms have changed. The law of consent is an example of an area affected by shifting standards.

{¶ 31} The original age of consent for sexual activity for females in the United States under the common law was ten years. *Michael M. v. Superior Court of Sonoma Cty.*, 450 U.S. 464, 494, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981), fn. 9

14

(Brennan, J., dissenting). From the 19th to the 20th century, the age of consent rose to 16 years under Ohio statutory law, and as high as 18 years old in other states. *See State v. Daniels*, 169 Ohio St. 87, 95, 157 N.E.2d 736 (1959); *Williams v. United States*, 327 U.S. 711, 724-725, 66 S.Ct. 778, 90 L.Ed. 962 (1946), fn. 29. Just prior to the omnibus revision to Ohio's criminal code in the 1970s, anyone over 17 years old was strictly criminally liable for engaging in sexual conduct with any female under 16. *See* former R.C. 2905.03.[3]

{¶ 32} When enacting the new R.C. Chapter 2907, the General Assembly intended that private sexual conduct between consenting adults ought not to be criminalized, but that the law ought to proscribe sexual conduct that is assaultive, that involves the young and immature, or that carries a significant risk of harm. Ohio Legislative Service Commission, *Summary of Am.Sub.H.B. 511* 13 (Dec. 1972).[4] The seriousness of harm or risk of harm is based on one or more of four factors: "the type of sexual activity involved; the means used to commit the offense; the age of the victim; and *whether the offender stands in some special relationship to the victim*." (Emphasis added.) *Id*.

{¶ 33} In accordance with these factors, the new R.C. Chapter 2907 increased the possibility of criminal liability for sexual conduct with prepubescent minors by removing the element of force that was previously required. *Compare* R.C. 2907.02(A)(1)(b) (prohibiting sexual conduct with a nonspouse who is "less than thirteen years of age, whether or not the offender knows the age of the other person") *with* former R.C. 2905.02 (1953 H.B. No. 1) (prohibiting sexual

---

[3] Former R.C. 2905.03 provided: "No person eighteen years of age or over shall carnally know and abuse a female person under the age of sixteen years with her consent." 1953 H.B. No. 1, repealed by Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1866.

[4] For example, 1972 Am.Sub.H.B. No. 511 repealed statutes that had criminalized sexual conduct solely due to marital status, *see* former R.C. 2905.08, 1953 H.B. No. 1 (adultery), solely due to kinship of any degree, *see* former R.C. 2905.07, *id.* (incest), or solely due to the specific sex acts involved, *see* former R.C. 2905.44, *id.* (sodomy). And "[d]istinctions of sex between offenders and victims [were] general[ly] discarded." Ohio Legislative Service Commission, *Summary of Am.Sub.H.B. 511* 13 (Dec. 1972).

intercourse with "a female person under twelve years of age, forcibly and against her will"). And it reduced the possibility of criminal liability for sexual conduct with minors aged 13 to 15 years old by eliminating strict liability and requiring proof that the offender acted knowingly or recklessly regarding the age of the victim. *Compare* R.C. 2907.04(A) ("No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard") *with* former R.C. 2905.03 ("No person eighteen years of age or over shall carnally know and abuse a female person under the age of sixteen years with her consent").

**{¶ 34}** Using the above four factors, the General Assembly created a new offense of sexual battery, R.C. 2907.03, to prohibit "sexual conduct with a person other than the offender's spouse in a variety of situations where the offender takes unconscionable advantage of the victim." Legislative Service Commission 1973 comment to R.C. 2907.03 as enacted by Am.Sub.H.B. No. 511. The version of R.C. 2907.03 currently in effect provides:

(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:

(1) The offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution.

(2) The offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.

(3) The offender knows that the other person submits because the other person is unaware that the act is being committed.

(4) The offender knows that the other person submits because the other person mistakenly identifies the offender as the other person's spouse.

(5) The offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person.

(6) The other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person.

(7) The offender is a teacher, administrator, coach, or other person in authority employed by or serving in [an elementary or secondary school], the other person is enrolled in or attends that school, and the offender is not enrolled in and does not attend that school.

(8) The other person is a minor, the offender is a teacher, administrator, coach, or other person in authority employed by or serving in an institution of higher education, and the other person is enrolled in or attends that institution.

(9) The other person is a minor, and the offender is the other person's athletic or other type of coach, is the other person's instructor, is the leader of a scouting troop of which the other person is a member, or is a person with temporary or occasional disciplinary control over the other person.

(10) The offender is a mental health professional, the other person is a mental health client or patient of the offender, and the offender induces the other person to submit by falsely representing to the other person that the sexual conduct is necessary for mental health treatment purposes.

(11) The other person is confined in a detention facility, and the offender is an employee of that detention facility.

(12) The other person is a minor, the offender is a cleric, and the other person is a member of, or attends, the church or congregation served by the cleric.

(13) The other person is a minor, the offender is a peace officer, and the offender is more than two years older than the other person.

(B) Whoever violates this section is guilty of sexual battery. Except as otherwise provided in this division, sexual battery is a felony of the third degree. * * *

{¶ 35} The first six subdivisions of R.C. 2907.03(A), which relate to an offender's parental relationship with the victim, the offender's authoritative relationship over a prisoner or patient, or the offender's knowing acts of coercion, trickery, or exploitation of a victim's inability to consent, were included in the original version of R.C. 2907.03 in 1974. Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1866, 1909. Subsequently, the statute was amended in response to incidents involving inappropriate sexual conduct committed by adults who had special authoritative relationships with minors or other vulnerable populations but who were not covered by subdivisions (1) through (6) of the statute.

{¶ 36} For example, almost 20 years after the passage of Am.Sub.H.B. No. 511, the Ottawa County prosecutor unsuccessfully attempted to prosecute a high school teacher and coach for violating R.C. 2907.03(A)(5) by engaging in sexual conduct with a 16-year-old student on school property. The Sixth District upheld the trial court's dismissal of the state's case. *State v. Noggle*, 6th Dist. Ottawa No. 91-OT-024, 1991 WL 2777821 (Dec. 31, 1991). We agreed with the Sixth District that a person cannot be considered, as a matter of law, to stand in loco parentis for

purposes of subdivision (A)(5) based solely on his or her role as a teacher. *State v. Noggle*, 67 Ohio St.3d 31, 34, 615 N.E.2d 1040 (1993). We held that the General Assembly had chosen to enumerate "specific situations where an offender might take unconscionable advantage of a victim," but that the teacher-student relationship was not among those enumerated. *Id.* at 33. We noted that sexual conduct in the context of a teacher-student relationship violated societal and professional standards, but it could not be considered a violation of R.C. 2907.03(A)(5), which "was not designed for teachers, coaches, scout leaders, or any other persons who might temporarily have some disciplinary control over a child." *Id.*

{¶ 37} Directly after our decision in *Noggle*, the General Assembly amended R.C. 2907.03 by adding subdivisions (A)(7) through (A)(9), making the statute applicable to the relationship between students and teachers, coaches, scout leaders, or any other persons who might temporarily have some disciplinary control. Am.Sub.H.B. No. 454, 145 Ohio Laws, Part IV, 6133-6134.

{¶ 38} The statute was next amended in an apparent response to outrage over cases in which psychologists had sex with their clients but received little to no punishment from their governing state boards of psychology. Ohio Senate Session, June 28, 2001, Part 1, available at *http://www.OhioChannel.org/MediaLibrary/Media.aspx?fileId=111704*, at 12:18-50. Initially, legislative efforts focused on criminalizing *any* sexual contact or conduct between mental-health professionals and their clients. Legislative Service Commission Bill Analysis of S.B. No. 9, as Introduced, 124th General Assembly. During the legislative debate, however, there were concerns about singling out one profession from the myriad of professions that serve vulnerable clients and about penalizing all consensual sexual activity between professionals and their clients regardless of the client's mental state. Ohio Senate Session, May 23, 2000, available at *http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=*

*111763*, at 25:35 to 29:03. A much more limited version of the bill ultimately became R.C. 2907.03(A)(10), which requires an affirmative unconscionable act by the mental-health professional in addition to the existence of the professional relationship with the client. Am.Sub.S.B. No. 9, 149 Ohio Laws, Part I, 1247.

{¶ 39} The next two additions, R.C. 2907.03(A)(11) and (12), returned to the broader scope of criminalizing sexual conduct based solely on relationships, specifically, the relationship between a detention-facility employee and a detainee and between a cleric and a minor parishioner. Am.Sub.H.B. No. 510, 149 Ohio Laws, Part V, 9296-9297; Am.Sub.S.B. No. 17, 151 Ohio Laws, Part I, 1144-1145. The addition of these relationships was spawned by a request from the Ohio Department of Rehabilitation and Correction and by the highly publicized media accounts of widespread child sexual abuse by religious leaders. *See* Ohio House of Representatives Hearing, May 23, 2002, available at *http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=112252*, at 7:19 to 9:59; Ohio Senate Hearing, Mar. 16, 2005, available at *http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=111520*, at 35:15 to 70:10.

{¶ 40} Finally, the General Assembly added the statutory provision at issue today, R.C. 2907.03(A)(13), in the wake of the incident that gave rise to *State v. Stout*, 3d Dist. Logan No. 8-06-12, 2006-Ohio-6089. Stout, a Logan County detective, had befriended the victim during his investigation of a case involving the victim. The state alleged that Stout became the victim's confidant, purporting to help the victim with her "emotional, psychological and physical healing process." *Id*. at ¶ 5. It was further alleged that shortly after the victim turned 16, she and Stout engaged in sexual conduct in Stout's sheriff's-office vehicle. *Id*.

{¶ 41} Similarly to the Ottawa County prosecutor in *Noggle*, the Logan County prosecutor pursued sexual-battery charges under R.C. 2907.03(A)(5). That

prosecution was unsuccessful. Stout's motion to dismiss on the basis that he was not a person in loco parentis was granted. *Id.* at ¶ 6.

**{¶ 42}** The case led to calls for modifying the law to add peace officers to the sexual-battery statute. *See* Ohio House Session, remarks of Rep. Anthony Core favoring adoption of H.B. No. 209, available at http://www.ohiochannel.org/video/house-session-may-7-2008 (May 7, 2008) at 44:10 to 45:21. The General Assembly responded. As enacted, R.C. 2907.03(A)(13) contains no professional-relationship-based requirement.

### *State Interests*

**{¶ 43}** The foregoing history demonstrates that the purpose of R.C. 2907.03 is to protect particularly vulnerable people, including minors and others who are legally unable to consent to sexual activity, from the harms that flow from sexual conduct. But in doing so, the General Assembly focused its criminalization of sexual conduct on those who use their professional status to take unconscionable advantage of minors, except in the case of peace officers. Peace officers are liable under the statute even if they did not use their status as peace officers to identify potential victims and abuse them.

**{¶ 44}** The state asserts two reasons for the legislature's classification of peace officers without regard to whether the peace officer uses his or her professional status to facilitate the forbidden sexual conduct: (1) holding peace officers to a higher standard to ensure integrity and to maintain the public trust and (2) protecting minors. We address each reason, mindful that whatever the legislative justification, we are obligated to consider any conceivable reason that the legislature *might* have had in enacting the classification. *Columbia Gas Transm. Corp. v. Levin,* 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 91*; Fed. Communications Comm. v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). *See also Romer*, 517 U.S. at 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 ("In the ordinary case, a law will be sustained if

it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous").

### 1. The state's interest in maintaining public confidence in law enforcement and ensuring the integrity of peace officers

{¶ 45} The state asserts that because peace officers hold a special position in society, the government has a legitimate interest in imposing standards on them that are higher than those that apply to every other Ohioan. That interest is widely accepted as legitimate. *See Warrensville Hts. v. Jennings*, 58 Ohio St.3d 206, 207, 569 N.E.2d 489 (1991) (noting "higher standard of conduct" for police officers).

{¶ 46} We agree that a peace officer occupies a unique position of public trust and authority that calls for special standards and penalties in many circumstances. *See, e.g.*, R.C. 2921.02 (bribery); R.C. 2921.41 (theft by public official); R.C. 2921.44 (dereliction of duty); R.C. 2921.45 (interfering with civil rights); R.C. 2907.03(A)(6) and (A)(11) (sexual battery of confined or detained person under officer's authority). But we do not agree that a person's status as a peace officer justifies the imposition of different sexual-conduct standards in circumstances in which the officer's status is irrelevant. The instant situation is just such a circumstance.

{¶ 47} The sexual conduct at issue here was unrelated to Mole's professional status. And the jury's failure to convict him of unlawful sexual conduct with a minor makes clear that, but for his status as a peace officer, Mole would not be subject to criminal liability for the sexual conduct at issue in this case. Indeed, because the jury was unable to conclude that Mole had knowingly had sexual relations with a minor or that he was reckless in not ascertaining the minor's age, *see* R.C. 2907.04(A), the trial judge declared a mistrial on the unlawful-sexual-conduct count and the state exercised its prerogative to dismiss that count of the indictment and to not retry Mole.

22

**{¶ 48}** The state urges that peace officers should be above suspicion of violation of the very laws they are sworn to enforce, and peace officers are regularly subjected to restrictions in their employment that are not applicable to ordinary citizens. When peace officers violate the high standards imposed on them by their professions, they are subject to discipline, including discharge. These interests are, of course, legitimate. As seen from the list of statutes above, the interest in holding peace officers to a higher standard is embedded in Ohio law. *See also* R.C. 737.11 (members of municipal police force shall obey and enforce all laws); *Ironton v. Rist*, 4th Dist. Lawrence No. 10CA10, 2010-Ohio-5292 (striking down reinstatement of officer who falsified traffic ticket as violating well-defined public policy favoring honest police force that commands the public trust); *Jones v. Franklin Cty. Sheriff*, 52 Ohio St.3d 40, 555 N.E.2d 940 (upholding dismissal of peace officer for conduct unbecoming an officer). And the need to maintain the efficiency and honesty of law enforcement serving the community is widely recognized. *See Pasadena Police Officers Assn. v. Pasadena*, 51 Cal.3d 564, 273 Cal.Rptr. 584, 797 P.2d 608 (1990) (affirming necessity of police internal investigations and discipline to assure public that officer misconduct is promptly and properly dealt with); *Gwynn v. Philadelphia*, 719 F.3d 295, 303 (3d Cir.2013) (need for public confidence justifies lower standard for testing reasonability of warrantless search of officers in internal-affairs investigation); *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (upholding hair-grooming requirement for male members of police force against Fourteenth Amendment challenge).

**{¶ 49}** But none of the cited authorities stand for the proposition that singling out the occupation of police officers for differential criminal treatment is rational when it is based on nothing more than the occupation itself. *See, e.g., Kelley* at 248 (noting that the personal-grooming regulations of police officers had a rational basis of ensuring a uniformity of appearance so that the officers are

"readily recognizable to the members of the public" or fostering esprit de corps within the force through similarity of appearance). All of the restrictions that the high court has held permissible are directly tied to the officer's conduct as an officer.

{¶ 50} To be sure, the kind of conduct criminalized by R.C. 2907.03(A)(13) could legitimately be used to justify the termination of a peace officer's employment.[5] *See* R.C. 737.12 (allowing suspension or dismissal of police officers for *any* reasonable cause, including "gross immorality"); *Jones v. Franklin Cty. Sheriff*, 52 Ohio St.3d at 43-44, 555 N.E.2d 940 (holding that public policy supports the termination of a police officer for any conduct unbecoming an officer, whether committed on or off duty). After all, the government has a valid interest in strictly controlling the immoral or unbecoming conduct of peace officers *as employees* regardless of any causal connection between the conduct and the employment itself. That governmental interest, however, does not justify differential treatment under the criminal law of peace officers acting *as private citizens* when there is no connection between the criminalized conduct and the office, duties, or other aspects of the occupation of a peace officer.

{¶ 51} Peace officers must accept certain burdens as part of their employment in order to maintain the honor and privilege of being peace officers and to foster public trust. They do not lose all of their rights as ordinary citizens, including their constitutional right to be treated equally under the criminal law, simply because they have chosen the profession of peace officer. *See Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) ("policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights").

---

[5] Mole resigned from his position at the Waite Hill Police Department immediately after he was criminally charged.

**{¶ 52}** Although the state's interest in maintaining public trust and confidence in peace officers is considerable and undeniably legitimate, R.C. 2907.03(A)(13), as currently worded, is a constitutionally impermissible attempt to further that interest.

### 2. The interest in protecting minors from sexual coercion

**{¶ 53}** The second interest offered by the state as justification for the classification of peace officers is the interest as "prohibiting peace officers from engaging in sex with children."      There is no dispute that the government has a legitimate, compelling interest in protecting the mental, emotional, and physical well-being of minors. *See, e.g., Globe Newspaper Co. v. Norfolk Cty. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens * * *." *Prince v. Massachusetts*, 321 U.S. 158, 168, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

**{¶ 54}** Accordingly, the Supreme Court has sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights. *See, e.g., Osborne v. Ohio*, 495 U.S. 103, 109-110, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (government's interest in protecting children from victimization in child-pornography industry justifies impingement on possessor's First Amendment rights); *New York v. Ferber*, 458 U.S. 747, 756-757, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography not entitled to First Amendment protection due to government interest in preventing exploitation and abuse of children). We, too, have recognized the state's interest in protecting minors, including protections from sexual exploitation. *State v. Young*, 37 Ohio St.3d 249, 256-257, 525 N.E.2d 1363 (1988) (upholding statute criminalizing possession of child pornography as justified by state's compelling interest in protecting children), *rev'd on other grounds sub nom. Osborne v. Ohio; State v. Romage,* 138 Ohio St.3d 390, 2014-

Ohio-783, 7 N.E.3d 1156, ¶ 10 (noting state's "legitimate and compelling interest in protecting children" from lewd acts). Whether articulated as a general interest in protecting minors, or more specifically as an interest in protecting minors from sexual exploitation by those with special access to them or an authoritative relationship over them, the legitimacy of this interest is clear.

{¶ 55} The decisive question is whether the statutory classification of peace officers is a rational means of advancing that interest.

{¶ 56} The state asserts that because R.C. 2907.03(A)(13) prohibits peace officers from engaging in sexual activity with persons under 18 years, it achieves the purpose of protecting minors from peace officers who use their authoritative relationship with minors to take unconscionable advantage of those minors in order to engage in sexual activity. In other words, the state urges us to agree that because the category of peace officers necessarily includes those officers who would abuse their authoritative relationship with minors to engage in sexual conduct with them, the classification of peace officers is rationally related to the governmental interest in protecting minors from sexual coercion. We decline to adopt that fallacious logic.

{¶ 57} There is no profession that per se makes its members more likely to engage in sexually predatory behavior, including sex with minors. Rather, federal studies show that three-quarters of child sexual abuse occurs at the hands of family members or others in the victim's "circle of trust," including their neighbors, teachers, coaches, scout leaders, youth-group volunteers, and doctors. Wingert, *Priests Commit No More Abuse than Other Males,* Newsweek (Apr. 7, 2010), available at: *http://www.newsweek.com/priests-commit-no-more-abuse-other-males-70625.* And although a pedophile may seek employment in a capacity that permits contact with children or access to them, a number of professions afford those opportunities. In addition to other ways of gaining access to children, "[a] pedophile may also seek employment where he will be in contact with children

26

*(e.g.*, teacher, camp counselor, babysitter, school bus driver, coach) or where he can eventually specialize in working with children *(e.g.*, physician, dentist, clergy member, photographer, social worker, law-enforcement officer)." Lanning, *Child Molestors: A Behavioral Analysis* (5th Ed.2010) 57, available at http://www.missingkids.org/en_US/publications/NC70.pdf. In other words, it is the access provided by the occupational relationship, and not the occupation by itself, that creates the risk of harm.

{¶ 58} Undeniably, the state has a valid, rational interest in proscribing the use of professional authority to sexually exploit minors or other vulnerable persons. And R.C. 2907.03(A) may have been born from the desire to prevent those in positions of authority or control from abusing that authority or control to sexually exploit vulnerable persons. But here, to obtain a conviction, the statute does not require the state to prove that Mole knew J.S. was a minor or that Mole was reckless in not knowing J.S. was a minor. Nor does it require the state to prove that Mole's sexual contact with J.S. had any connection to Mole's status as a peace officer. Thus, although the state's interest in protecting minors from sexual conduct is rational, the classification of peace officers in R.C. 2907.03(A)(13) is not. Indeed, the irrationality of the R.C. 2907.03(A)(13) classification is evident when considered in the larger context of the statutory scheme at issue here, which otherwise requires that there be a nexus between the offender's employment and the offender's illegal conduct with a child or other defenseless person.

{¶ 59} R.C. 2907.03(A)(13) omits any mention of a relationship between the conduct and the profession.

{¶ 60} To obtain a conviction under R.C. 2907.03(A)(13), the state does not need to prove the existence of any authoritative relationship. But in other sections of the statute, the state must demonstrate that the potential offenders used trickery or occupied a position of authority in order to make sexual conduct with the victim a crime under the statute. How is it rational to require that the state demonstrate

that offenders in other professions that provide access to children, including coaches, teachers, clerics, employees of detention facilities, and scout leaders,[6] used their professional capacity to exploit the victim, but to omit that requirement if the offender is a peace officer?  This irrationality is particularly evident in light of the legislative history of the act (in which amendments to the law followed reports of incidents in which the offender had misused his or her professional capacity to commit the crime) and the knowledge that many professions afford offenders access to children.

{¶ 61} "[E]qual protection requires * * * that reasonable grounds exist for making a distinction between those within and those without a designated class." *State v. Buckley*, 16 Ohio St.2d 128, 134, 243 N.E.2d 66 (1968).   When criminalization is based solely on the status of the classified group without any relationship to a legitimate state interest, the classification may be found to be unconstitutionally arbitrary.  *See Wheeling Steel Corp. v. Glander*, 337 U.S. 562, 69 S.Ct. 1291, 93 L.Ed. 1544 (1949) (discriminatory taxation of out-of-state entities based solely on residency status is arbitrary and violates equal protection); *Metro. Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (same). The statute at issue here reflects impermissible arbitrariness.

{¶ 62} Moreover, we are cognizant that the failure to include the relationship element in R.C. 2907.03(A)(13) does not merely ease the state's burden of proving the risk of unconscionable advantage, but rather, it *entirely* eliminates the state's burden of proof beyond establishing the age of the minor, the profession of the peace officer, and the fact that sexual conduct took place.

{¶ 63} There is some indication that the legislature's omission of the relationship element might have been meant to ease the prosecutorial burden of

---

[6] The scout leader, for instance, must be the victim's scout leader.  R.C. 2907.03(A)(10).  If the offender is a cleric, the victim must be a member of the congregation or church served by the cleric. R.C. 2907.03(A)(12).

proof. Ohio Senate Session, Dec. 16, 2008, available at *http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=117520*, 39:10-20 ("the sponsor had some concerns with the prosecutors about the ability to prosecute under that section"). If that motive did in fact figure in the removal of that element, it may have been well intended,[7] but that does not make it constitutionally sufficient. Undoubtedly, most prosecutorial burdens would be eased by removing constitutional protections of individuals, including the rights to counsel, due process, and equal protection and the rights against self-incrimination and warrantless searches. "[T]he legislature may go a good way in raising [presumptions] or in changing the burden of proof, but there are limits. * * * [I]t is not within the province of a legislature to declare an individual guilty *or presumptively guilty* of a crime." (Emphasis added.) *McFarland v. Am. Sugar Refining Co.*, 241 U.S. 79, 86, 36 S.Ct. 498, 60 L.Ed. 899 (1916) (invalidating a statute that imposed a rebuttable presumption that a refiner who systematically purchases sugar in Louisiana for less than the refiner pays elsewhere has violated antimonopoly laws). *Compare United States v. Freed*, 401 U.S. 601, 609-610, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (strict criminal liability for possession of unregistered hand grenades is justified because no reasonable person would believe that possessing such highly dangerous offensive weapons is an innocent act) *with Tot v. United States*, 319 U.S. 463, 468, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943) (striking down as irrational a statutory presumption that a person previously convicted of a crime of violence who is found in possession of a firearm must have received that firearm in interstate commerce).

{¶ 64} We must conclude that R.C. 2907.03(A)(13) imposes strict liability on Mole via an irrational presumption. There is absolutely no ground for presuming

---

[7] We see no practical difficulty in proving the existence of an authoritative relationship. It should be a simple matter to prove that a peace officer's acquaintance with or interactions with a particular minor arose from, or occurred during, the performance of the peace officer's duties.

that Mole used his status as a peace officer to gain access to or bend the will of J.S. or to facilitate the sexual conduct by any means connected to his occupation. And there is no dispute that J.S. was unaware of Mole's occupation and that Mole's interaction with J.S. had absolutely no connection with Mole's occupational status.

{¶ 65} The state argues that in many other sexual encounters involving peace officers and minors, there will be such a connection, and that Mole therefore cannot prove that R.C. 2907.03(A)(13) is unconstitutional in all applications. But it is unlikely that proof of such a connection, let alone proof of an unconscionable advantage flowing from that connection, will ever be part of any prosecution under R.C. 2907.03(A)(13), because there is no need to prove, and thus no opportunity to disprove, the connection.

{¶ 66} Ohio has codified the exception that dispenses with the necessity to prove scienter in sex offenses committed against victims under the age of consent. *See*, *e.g.,* R.C. 2907.02(A)(1)(b), which eliminates scienter from the offense of rape when the victim is under the age of 13. Maintaining strict liability in situations such as child rape is well supported. Scienter is justifiably imputed in such cases. The physical immaturity of a prepubescent child is obvious, and engaging in sexual behavior with a child indicates a vicious will on the part of the offender. A prepubescent child's undeveloped physical features will, by themselves, provide notice of the child's age, and thus the potential offender is presumed to know that sexual activity with that child is proscribed. *In re D.B.*, 129 Ohio St.3d 104, 2011-Ohio-2671, 950 N.E.2d 528, ¶ 18. Scienter may also be imputed in situations where offenders engage in sexual activity with someone over whom they have great authority and control. *See* R.C. 2907.03(A)(6) through (9).

{¶ 67} But in R.C. 2907.03(A)(13), scienter is not imputed from any factor that might justify inferring a guilty knowledge or a nefarious intent. No factor such as the victim's inability to consent or the offender's authority to compel consent is provided. Instead, scienter is imputed, improperly, from the mere occupational

status of the offender, and that imputation applies to all peace officers, even when the victim is entirely ignorant of the offender's status and thus cannot have been exploited in any way that is connected to that status.

{¶ 68} The differential treatment of peace officers in this statutory scheme is based on an irrational classification. The statute not only fails to include any relationship or other element that justifies the omission of a scienter requirement, but also disparately affects peace officers in a way that bears no rational relationship to the government's interest in protecting minors from sexual coercion by people in positions of authority who use that authority to compel submission. Having carefully considered the compelling interests at play here, the constitutional protections afforded our citizens, and the strong presumption of constitutionality that can only be overcome by a showing that the statute clearly and unequivocally violates the Constitution, we are compelled to conclude that R.C. 2907.03(A)(13) violates the Equal Protection Clause of the Ohio and United States Constitutions.

## CONCLUSION

{¶ 69} We do not condone the conduct of appellee. Nor do we easily reach our conclusion that R.C. 2907.03(A)(13) represents a "classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Romer*, 517 U.S. at 635, 116 S.Ct. 1620, 134 L.Ed.2d 855.

{¶ 70} Although the government has a compelling interest in protecting minors from sexual coercion and an interest in prohibiting peace officers from abusing their authority in order to sexually exploit minors, the government cannot punish a class of professionals without making a connection between the classification and the prohibited act. We therefore affirm the judgment of the Eighth District Court of Appeals, declaring R.C. 2907.03(A)(13) to be unconstitutional on its face.

Judgment affirmed.

PFEIFER and O'NEILL, JJ., concur.

LANZINGER, J., concurs in judgment only, in an opinion.

KENNEDY, J., dissents in an opinion that O'DONNELL, J., joins.

FRENCH, J., dissents in an opinion that O'DONNELL, J., joins.

_____

**LANZINGER, J., concurring in judgment only.**

{¶ 71} "The decisions of the [United States Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them." (Footnote omitted.) Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489, 502 (1977).

{¶ 72} Based on the analysis that the Ohio Constitution is a document of independent force, I join the majority in judgment only.

_____

**KENNEDY, J., dissenting.**

{¶ 73} Respectfully, I dissent. Since 1895, we have held that the Ohio Equal Protection Clause provides the same protection as the federal Equal Protection Clause. *See State ex rel. Schwartz v. Ferris*, 53 Ohio St. 314, 41 N.E. 579 (1895), paragraph four of the syllabus. Today, the majority, without any analysis of the differences in the text of those provisions or any consideration of the history of the Ohio and federal Equal Protection Clauses, departs from that century-old precedent and declares that the Ohio Equal Protection Clause affords more protection than the Fourteenth Amendment in order to invalidate R.C. 2907.03(A)(13). Because the majority has stretched the precedent of this court and that of the United States Supreme Court to the breaking point, I must dissent.

{¶ 74} Absent a textual or historical analysis that demonstrates that we should depart from our longstanding precedent, there is no reason to do so today.

Because the federal and Ohio Equal Protection Clauses afford the same protection, and because the statute is rationally related to a valid state interest, R.C. 2907.03(A)(13) is constitutional.

## I.  PRELIMINARY ISSUES

{¶ 75} I agree with the majority's recitation of the facts. The majority is also correct that the appropriate standard of review is the "rational-basis test" because R.C. 2907.03(A)(13) does not implicate a suspect class or fundamental right. *Arbino v. Johnson & Johnson,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 64.  Additionally, the majority correctly holds that R.C. 2907.03(A)(13) meets the first requirement of rational-basis review because the statute reflects a legitimate state interest in maintaining the public's confidence in peace officers by ensuring that their integrity is above reproach.  *Id.* at ¶ 66 (statute must be upheld if it is rationally related to a legitimate governmental interest).

{¶ 76} I part with the majority, however, in its declaration that Article I, Section 2 of the Ohio Constitution affords greater protection than the Fourteenth Amendment to the United States Constitution.  I further disagree that R.C. 2907.03(A)(13) is facially unconstitutional and that the statute is not rationally related to a valid state interest.

## II.  ANALYSIS

*A. The Ohio Equal Protection Clause does not afford greater protection than the federal Equal Protection Clause*

{¶ 77} The majority declares the statute unconstitutional on the bases of the federal and Ohio Equal Protection Clauses, then concludes that even if it is wrong about the application of the Fourteenth Amendment, the Ohio Constitution's Equal Protection Clause "independently forbid[s] the disparate treatment of peace officers."

**{¶ 78}** In support of its decision, the majority relies on *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42, 616 N.E.2d 163 (1993). *Arnold* is the first case wherein this court interpreted the Ohio Constitution as providing greater protection than the federal Constitution. However, today's majority fails to provide any of the careful analysis set forth in the *Arnold* opinion to justify its conclusion that the Ohio Constitution affords greater protection.

**{¶ 79}** In *Arnold*, we examined the right to bear arms in light of Article I, Section 4 of the Ohio Constitution and the Second Amendment. We recognized that the Ohio Constitution contained language that is not included in the federal Constitution. *Id*. at 43. We noted that the additional language indicated that the people of Ohio chose "to go even further" than the Second Amendment's focus on the preservation of a militia. *Id.* In securing to every person an individual right to bear arms, the Ohio provision, unlike the federal provision, "was obviously implemented to allow a person to possess certain firearms for defense of self and property." *Id.* Therefore, the *Arnold* court advanced a rationale for interpreting the Ohio Constitution differently than the federal provision. We then went on to examine the history of the Ohio constitutional provision and the lack of debate that attended both the original version and its 1851 revision, which demonstrated the wide acceptance and uncontroversial nature of the right to possess and use certain arms. *Id*.

**{¶ 80}** *Arnold* serves as the model for the type of the analysis this court should undertake when deciding whether the Ohio Constitution offers greater protection than the federal Constitution. However, this analytical framework is absent from the majority opinion.

**{¶ 81}** In lieu of a textual or historical analysis, the majority cites five cases as authority for its position that this court "heeded the hortatory call to the new federalism." I agree that those cases do indeed reflect the new federalism in that they conclude that a provision of the Ohio Constitution can afford greater protection

than its federal counterpart. However, three of those cases involved a careful comparison and analysis of the text of the Ohio and federal provisions at issue, such as appeared in *Arnold* but not in today's majority. The other two cases cited by the majority, *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, and *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, are highly distinguishable from the case here.

{¶ 82} In the three cases where we proactively interpreted the Ohio Constitution to provide greater protection than the federal Constitution, or at least reserved the power to do so, we engaged in an *Arnold* analysis by examining the text and history of the provision before taking the formidable step of declaring that a provision of the Ohio Constitution is more protective.

{¶ 83} In *Simmons-Harris v. Goff*, we examined the Establishment Clause in the Ohio and federal Constitutions, and we concluded that the language in the Ohio clause is quite different from the federal. 86 Ohio St.3d 1, 10, 711 N.E.2d 203 (1999). We also observed that while in the past we had discussed the Ohio and federal clauses together, "[t]here is no reason to conclude that the Religion Clauses of the Ohio Constitution are coextensive with those in the United States Constitution * * *." *Id*. As a result, we stated we would not "irreversibly tie ourselves" to the United States Supreme Court's interpretation of the federal Establishment Clause.

{¶ 84} In *Humphrey v. Lane*, we concluded that the protection provided by the Ohio Constitution's Free Exercise Clause goes beyond that provided by the federal Constitution's Free Exercise Clause. 89 Ohio St.3d 62, 67, 728 N.E.2d 1039 (2000). We reached this conclusion because we determined that the phrase "nor shall any interference with the rights of conscience be permitted" is broader than the federal Constitution's prohibition against laws that prohibit the free exercise of religion. *Id*.

**{¶ 85}** Finally in *Norwood v. Horney*, we compared the Ohio Takings Clause with its federal counterpart. 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115. We held that unlike the federal Constitution as interpreted by the United States Supreme Court, the Ohio Constitution prohibited government appropriation of private property when the sole justification was economic benefit to the community. *Norwood* at ¶ 75.

**{¶ 86}** The majority's reliance on *Farris* and *Brown* is also misplaced. These two cases are highly distinguishable from the case at bar because both involved a reaffirmation of our view that the Ohio Constitution provides greater protection even after the United States Supreme Court narrowed the protections of the federal counterpart. *Farris,* 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 48-49, and *Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, ¶ 22. The state is not arguing that an intervening case imposing a narrower, more restrictive interpretation of the federal Equal Protection Clause by the United States Supreme Court requires a similar restriction of the Ohio Equal Protection Clause.

**{¶ 87}** In *Farris*, we examined the admissibility of physical evidence seized as a result of unwarned statements in a criminal trial. *Farris* at ¶ 48. While acknowledging that such evidence would be admissible under the Fifth Amendment, *id.* at ¶ 45, we held that Article I, Section 10 of the Ohio Constitution prohibited its admission. We concluded that the Ohio Constitution was more protective than the Fifth Amendment because "the overall administration of justice in Ohio requires a law-enforcement environment in which evidence is gathered in conjunction with *Miranda,* not in defiance of it." *Id.* at ¶ 49. "[T]o hold otherwise would encourage law-enforcement officers to withhold *Miranda* warnings and would thus weaken Section 10, Article I of the Ohio Constitution." *Id.*

**{¶ 88}** This holding was in response to the United States Supreme Court's decision in *United States v. Patane*, in which the court held that the failure to give *Miranda* warnings does not require the suppression of physical evidence seized

36

from a suspect as a result of the unwarned voluntary statements. 542 U.S. 630, 631, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). We decided *Farris* two years after *Patane*. We declined to follow the *Patane* court and declared that the Ohio Constitution provided greater protection to criminal defendants than the Fifth Amendment. *Farris* at ¶ 48.

{¶ 89} In *Brown*, our decision was in response to the United States Supreme Court's decision in *Atwater v. Lago Vista*, which held that a warrantless arrest for a misdemeanor did not violate the Fourth Amendment even when the offense did not involve a breach of the peace. 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001), and *Brown* at ¶ 21. The United States Supreme Court concluded that when the Fourth Amendment was framed, the common law permitted warrantless arrests for similar offenses. Atwater at 326-340. One year prior to the Atwater decision, in State v. Jones, we had examined the same issue, and we held that warrantless arrests for minor misdemeanors, which are crimes that do not involve a breach of the peace, are not permissible under the Ohio and federal Constitutions. 88 Ohio St.3d 430, 727 N.E.2d 886 (2000), syllabus. Two years after *Atwater*, we decided *Brown*, and we declined to extend the holding in *Atwater* to the Ohio Constitution. *Brown* at ¶ 7.

{¶ 90} Based on our precedent, in order to hold that the Ohio Constitution is more protective than federal Constitution, the majority needs to point to some language in Article I, Section 2 of the Ohio Constitution that is different than the language of the Fourteenth Amendment. The majority opinion is silent on this point.

{¶ 91} It appears that the majority's interpretation of Ohio's Equal Protection Clause is not based on its text or history but on the majority's sense of judicial necessity. However, our constitutional interpretation should be guided exclusively by the language and history of the clause at issue.

**{¶ 92}** The majority acknowledges that we have previously held that the federal and Ohio Equal Protection Clauses are to be construed and analyzed identically, citing *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 60, 717 N.E.2d 286 (1999). However, the majority does not distinguish that case from the present one in any way that would justify its departure from that holding. Instead, the majority merely cites *Arnold* for the general proposition that "the Ohio Constitution is a document of independent force." Majority opinion at ¶ 14. That statement is true enough, but hardly sufficient by itself. Moreover, the majority is silent regarding our long line of precedent, beginning in 1895, holding that the protection provided by the Ohio Equal Protection Clause is identical to that provided by the Fourteenth Amendment's Equal Protection Clause.

**{¶ 93}** In *State ex rel. Schwartz v. Ferris*, we announced that the federal Equal Protection Clause was "not broader than the second section of our bill of rights." 53 Ohio St. at 341, 41 N.E. 579. In 1937, we again said that "the 'equal protection of the law' provision * * * is *substantially the same* as the guarantee in that respect contained in the Fourteenth Amendment to the federal Constitution." (Emphasis added.) *State ex rel. Struble v. Davis*, 132 Ohio St. 555, 560, 9 N.E.2d 684 (1937). In 1975, we held that "[t]he limitations placed upon governmental action by the Equal Protection Clauses of the Ohio and United States constitutions are *essentially identical*." (Emphasis added.) *Kinney v. Kaiser Aluminum & Chem. Corp.*, 41 Ohio St.2d 120, 123, 322 N.E.2d 880 (1975). *See also State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 8, 399 N.E.2d 66 (1980) (same). In 1999, we declared that "the Equal Protection Clause of the United States Constitution, contained in the Fourteenth Amendment, and the Equal Protection Clause of the Ohio Constitution, contained in Section 2, Article I, are *functionally equivalent*." (Emphasis added.) *Desenco, Inc. v. Akron*, 84 Ohio St.3d 535, 544, 706 N.E.2d 323 (1999). As recently as 2010, we reiterated that "[t]he federal and Ohio equal-

protection provisions are 'functionally equivalent.' " *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray,* 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N,E.2d 944, at ¶ 17, quoting *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, 930 N.E.2d 770, ¶ 38.

{¶ 94} Although the majority effectively overrules these cases, glaringly absent from the majority's opinion is the rigorous three-step analysis required before this court may overturn a prior decision. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, paragraph one of the syllabus.

{¶ 95} Rejecting 120 years of precedent and without any of the analysis reflected in *Arnold*, the majority invalidates R.C. 2907.03(A)(13) because it believes that the statute is "arbitrary."

*A.  R.C. 2907.03(A)(13) is not Facially Unconstitutional*

*and Survives Rational-Basis Review*

*1.  Facial Challenges Are Disfavored*

{¶ 96} The majority concludes that R.C. 2907.03(A)(13) is facially unconstitutional. Majority opinion at ¶ 2.  The judicial authority to override the legislative will should be used with extreme caution and restraint, because declaring a statute unconstitutional based on a facial challenge is an "exceptional remedy." *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir.2010).  "A facial challenge alleges that a statute, ordinance, or administrative rule, on its face and under all circumstances, has no rational relationship to a legitimate governmental purpose." *Wymsylo v. Bartec, Inc*., 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 21.  This type of challenge is the most difficult to successfully mount because the challenger must establish that no set of circumstances exists under which the act would be valid. *Id*., citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).  "The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334,

836 N.E.2d 1165, ¶ 37. "In order for a statute to be facially unconstitutional, it must be unconstitutional in all applications." *Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership,* 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, ¶ 13, citing *Harrold* at ¶ 37, and *Salerno* at 745. These challenges seek to remove a law from the books, i.e., to "leave nothing standing." *Warshak v. United States*, 532 F.3d 521, 528 (6th Cir.2008).

{¶ 97} Facial challenges are "contrary to the fundamental principle of judicial restraint." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). A facial challenge forces the court to " ' "anticipate a question of constitutional law in advance of the necessity of deciding it" ' " and to " ' "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." ' " *Id.* at 450, quoting Ashwander v. *Tennessee Valley Auth.,* 297 U.S. 288, 346-347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), quoting *Liverpool, New York & Philadelphia Steamship Co. v. Emigration Commrs.,* 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed 899 (1885). They raise the risk of a " 'premature interpretatio[n] of statutes' on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004), quoting *United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1964). Because of the breadth of the remedy and the loosening of judicial restraint involved in facial constitutional litigation, courts disfavor facial challenges. *Washington State Grange*, 552 U.S. at 450, 128 S.Ct. 1184, 170 L.Ed.2d 151. Courts do and should prefer as-applied challenges, which are the " 'basic building blocks of constitutional adjudication.' " *Gonzales v. Carhart*, 550 U.S. 124, 168, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), quoting Fallon, *As-Applied and Facial Challenges and Third-Party Standing,* 113 Harv.L.Rev. 1321, 1328 (2000).

## 2. R.C. 2907.03(A)(13) is Rationally Related to a Valid State Interest

{¶ 98} When a statute is challenged as facially unconstitutional and when, as here, the standard of review is the rational-basis standard, the court must conduct a two-step analysis: "We must first identify a valid state interest. Second, we must determine whether the method or means by which the state has chosen to advance that interest is rational." *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 9, citing *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.*, 73 Ohio St.3d 260, 267, 652 N.E.2d 952 (1995); *Pickaway Cty. Skilled Gaming*, 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 19. As to the first step, the majority finds a valid state interest in play, but concludes that the second step is not satisfied because the method or means chosen to advance the interest is not rational. I disagree.

{¶ 99} The second step in a rational-basis review requires us to determine whether the law is rationally related to a valid state interest. If a statute is challenged as facially unconstitutional, the challenger must demonstrate that the statute can never be applied in a manner that is rationally related to a valid state interest and show instead, that it is "unconstitutional in all applications." *Oliver*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, ¶ 13, citing *Harrold*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, at ¶ 37, and *Salerno* 481 U.S. at 745, 107 S.Ct. 2095, 95 L.Ed.2d 697. Those arguing that a statute's classification violates equal protection have the burden of rebutting every conceivable basis that might support it. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). A statute will survive a facial equal protection challenge when there is a legitimate state interest with a rational basis, that is, when the means and method the state uses to further that interest has some reasonable basis. *McCrone* at ¶ 8. As we have held:

> Legislative enactments that do not involve a suspect classification are "presumptively rationally related to legitimate social and economic goals, unless the 'varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.' "

*McCrone*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, at ¶ 30, quoting *State ex rel. Doersam v. Indus. Comm.*, 40 Ohio St.3d 201, 203, 533 N.E.2d 321 (1988), quoting *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

{¶ 100} There is a "strong presumption of validity" that the United States Supreme Court has repeatedly applied when a statute, challenged as unconstitutional, does not involve fundamental rights or a suspect classification. *Fed. Communications Comm. v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 462-463, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988); *Hodel v. Indiana*, 452 U.S. 314, 331–332, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314-315, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). While the majority holds that R.C. 2907.03(A)(13) does not involve a fundamental right or suspect classification, it merely pays lip service to the strong presumption that R.C. 2907.03(A)(13) is constitutional in its rush to invalidate the statute because it believes that it is based on fallacious logic.

{¶ 101} Like the United States Supreme Court, we too have held that it is not within the purview of rational-basis review to decide whether a statute is wise or misguided. We have observed:

> The vast weight of authority requires that, when utilizing the "rational basis" test, the courts defer to the legislature on the issue of constitutionality. "We do not inquire whether this statute is wise or desirable * * *. * * * Misguided laws may nonetheless be constitutional."

*Morris v. Savoy*, 61 Ohio St.3d 684, 692, 576 N.E.2d 765 (1991), quoting *James v. Strange*, 407 U.S. 128, 133, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972). We have also observed that "[i]t is a fundamental principle that the determination of the propriety, wisdom, policy or expediency of legislation is not within the judicial function and laws may not be declared invalid by the courts because deemed inexpedient or unwise * * *." *State v. Parker*, 150 Ohio St. 22, 24, 80 N.E.2d 490 (1948).

{¶ 102} Additionally, " 'courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.' " *Pickaway Cty. Skilled Gaming*, 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 32, quoting *Am. Assn. of Univ. Professors,* 87 Ohio St.3d at 58, 717 N.E.2d 286. Furthermore, a classification does not fail rational-basis review merely because it is not made with mathematical precision or because it results in some inequality. *Id.*

{¶ 103} The majority concludes that R.C. 2907.03(A)(13) violates the Equal Protection Clause because the General Assembly's decision to treat peace officers differently than other people who hold positions of trust based solely on their profession is not logical. The purpose of the Equal Protection Clause is not to allow courts to repeal laws that they believe are illogical. Instead, as the United States Supreme Court has explained, " ' "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination * * *." ' " *Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), quoting

*Sioux City Bridge Co. v. Dakota Cty., Nebraska,* 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923), quoting *Sunday Lake Iron Co. v. Wakefield*, 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918).

{¶ 104} Criminalizing sexual conduct between a peace officer and a minor is rationally related to a legitimate state interest because it punishes peace officers for conduct that if discovered would diminish them in the eyes of the community. If a peace officer discovered after the fact that the person with whom he engaged in sexual conduct was a minor, he would have a strong incentive to do whatever is necessary to ensure that his employer never found out, even to the point of compromising his integrity. Moreover, there is the potential for blackmail, which could lead to corrupt behavior or worse. These considerations demonstrate how the statute is rationally related to a legitimate government interest of protecting the public trust in peace officers by criminalizing conduct that is not only immoral but is fraught with the potential for corruption and exploitation.

{¶ 105} The majority's argument at its core is simply that the statute is arbitrary because peace officers are held criminally liable for engaging in sexual conduct with minors when that conduct is not connected with their status as peace officers. However, the proper analysis for a facial challenge of a statute using the rational-basis standard of review is not whether the statute is unconstitutional in the challenged circumstance but whether the statute can ever be applied in a constitutional manner. *See Oliver*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, at ¶ 13. The majority's analysis must support the conclusion that the statute is "unconstitutional in all applications," *id.*, and it must "rebut every conceivable basis which might support it." *Lehnhausen*, 410 U.S. at 364, 93 S.Ct. 1001, 35 L.Ed.2d 351.

{¶ 106} Instead the majority focuses its analysis on why the statute is unconstitutional when applied to appellee and his circumstances. However, the majority does not rebut the application of the statute to peace officers who do have

some professional connection to the victim or to peace officers who meet a minor in the course of their duties as a peace officer after engaging in sexual conduct with the minor. The majority merely states that the state is not required to prove a professional connection between the peace officer and victim because it is not an element of the offense.

{¶ 107} This reasoning fails because it shifts the burden of proving that the statute is unconstitutional in all circumstances from the party challenging the statute to the state. "[T]he challenger must establish that there exists no set of circumstances under which the statute would be valid." *Harrold*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37. Appellee chose to mount a facial attack on the statute, so he must show that all applications of the statute bear no rational relation to any valid state interest. It is not the state's burden to introduce evidence to prove constitutionality.

{¶ 108} The majority admits that the statute would be constitutional if the General Assembly had included a nexus between the peace officer's professional status and the minor with whom he engages in sexual conduct. However, the statute criminalizes this category of conduct between peace officers and minors as part of its broad prohibition against sexual conduct between peace officers and minors. The majority admits that the statute would achieve its legitimate state interest by a rational means and method if applied to a peace officer who uses his professional status to initiate sexual conduct with a minor. Under the majority's own reasoning, the statute is not "unconstitutional in all applications." *Oliver*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, at ¶ 13. Therefore, the statute cannot be facially unconstitutional because it can be constitutionally applied in some instances. *Id*.

## III. CONCLUSION

{¶ 109} Since 1895, we have held that the Ohio Equal Protection Clause provides the same protection as the federal Equal Protection Clause. Absent a textual or historical analysis supporting a departure from that precedent, there is no

reason to do so today. Because the federal and Ohio Constitution Equal Protection Clauses afford the same protection and R.C. 2907.03(A)(13) does not target a fundamental right or suspect class, our analysis is limited to a rational-basis review. Because the statute involves a valid state interest and the statute is rationally related to that valid state interest, I would find that R.C. 2907.03(A)(13) is constitutional. Therefore, I dissent.

O'DONNELL, J., concurs in the foregoing opinion.

_____

**FRENCH, J., dissenting.**

{¶ 110} I dissent from the majority's decision and would hold that R.C. 2907.03(A)(13) does not violate the guarantees of equal protection under the Fourteenth Amendment to the United States Constitution or Article I, Section 2 of the Ohio Constitution.

{¶ 111} The majority, while noting the presumption of constitutionality and deference afforded to legislative enactments under rational-basis review, has in fact applied an elevated level of judicial scrutiny. As the party invoking the extreme remedy of striking down an entire statute on its face, Mole must "negate every conceivable basis that might support the legislation." *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 91. Mole has not met this very high burden.

{¶ 112} In its analysis, the majority failed to consider applications of the statute that might support its validity, as rational-basis scrutiny requires. Instead, the majority concludes that the imposition of criminal liability on peace officers under the circumstances in Mole's case—"when there is no occupation-based relationship between the officer and the victim"—violates equal protection. Majority opinion at ¶ 2. But the General Assembly enacted this law in the wake of *State v. Stout*, 3d Dist. Logan No. 8-06-12, 2006-Ohio-6089, which arose when a detective allegedly used his position of trust to engage in sexual conduct with a 16-

year-old victim and witness of a murder-suicide involving her family. *Stout* at ¶ 5. *See also* Ohio House Session, May 7, 2008, Am.Sub.H.B. No. 209, available at http://www.ohiochannel.org/video/house-session-may-7-2008 at 44:03.

{¶ 113} The *Stout* case demonstrates one set of circumstances falling under the legitimate sweep of the statute, that is, when a peace officer's unlawful sexual conduct with a minor relates directly to the officer's professional status. And because the statute has at least some valid application that is rationally related to a legitimate state interest, it must survive a facial challenge. *Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, ¶ 13.

{¶ 114} The majority also concludes that R.C. 2907.03(A)(13) does not bear a rational relationship to the state's interest in protecting minors from sexual coercion. On the one hand, the majority deems the statute overinclusive because it designates all peace officers for differential treatment when only some officers might abuse their authoritative positions. Majority opinion at ¶ 57. On the other hand, the majority deems the statute underinclusive because members of other professions with access to children are just as likely to engage in sexual predation. *Id*. at ¶ 58.

{¶ 115} Rational-basis review, however, does not demand "mathematical exactitude," *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), and we are compelled under this deferential standard " ' "to accept a legislature's generalizations even when there is an imperfect fit between means and ends." ' " *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 32, quoting *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 58, 717 N.E.2d 286 (1999), quoting *Fed. Communications Comm. v. Beach Communications, Inc.*, 508 U.S.307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). The General Assembly determined that the privilege of serving as a peace officer comes with the obligation

to adhere to a higher standard of conduct both on and off duty. As permitted under rational-basis scrutiny, the legislature concluded that the benefits of prohibiting all such sexual encounters between peace officers and minors outweigh the risk of underinclusion.

{¶ 116} I would therefore conclude that R.C. 2907.03(A)(13) is rationally related to the state's legitimate interests in preserving public confidence in the integrity of law-enforcement officers and in protecting minors from sexual predation.

{¶ 117} I also dissent from the majority's conclusion that the Ohio Constitution provides an independent basis to invalidate R.C. 2907.03(A)(13). *See* majority opinion at ¶ 23 ("even if we have erred in our understanding of the federal Constitution's Equal Protection Clause, we find that the guarantees of equal protection in the Ohio Constitution independently forbid the disparate treatment of peace officers * * *"). Once again, the majority has declared without any textual analysis or support that a right secured by the Ohio Constitution affords broader protection to its citizens than the federal Constitution. *See State v. Bode*, 144 Ohio St.3d 155, 2015-Ohio-1519, 41 N.E.3d 1156, ¶ 31-42 (French, J., dissenting); *State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496, ¶ 28-43 (French, J., dissenting). I wholeheartedly agree that the Ohio Constitution may provide greater protection of individual rights than the federal Constitution and that "[f]ederal opinions do not control our independent analyses in interpreting the Ohio Constitution * * *." Majority opinion at ¶ 21. But that is exactly what is missing from the majority's opinion: an independent analysis of the equal-protection guarantee in Article I, Section 2 of the Ohio Constitution premised on its language, history or early understandings. Absent that analysis, the majority has not presented any " ' "compelling reasons why Ohio constitutional law should differ from the federal law." ' " *Brown* at ¶ 34 (French, J., dissenting), quoting *Bode* at

¶ 33 (French, J., dissenting), quoting *State v. Wogenstahl*, 75 Ohio St.3d 344, 363, 662 N.E.2d 311 (1996).

{¶ 118} Even more puzzling, after declaring that Article I, Section 2 of the Ohio Constitution affords greater protection than the federal Equal Protection Clause, the majority does not articulate a new rule or standard for examining equal-protection claims under the Ohio Constitution. Rather, the majority recites a substantially similar rational-basis test under both the Ohio and federal Constitutions. *See* majority opinion at ¶ 27. In the end, it is unclear what the majority accomplishes with its declaration of independence from federal precedent, other than inviting parties to invoke the Ohio Constitution as an alternative basis for relief when they cannot obtain the desired outcome under the federal Constitution.

{¶ 119} For these reasons, I respectfully dissent.

O'DONNELL, J., concurs in the foregoing opinion.

_____

Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, for appellant.

John Fatica and Richard J. Perez, for appellee.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, Michael J. Hendershot, Chief Deputy Solicitor, and Kathryn L. Kreps, Assistant Attorney General, urging reversal for amicus curiae, Ohio Attorney General Michael DeWine.

_____